Charles T. LORD, Petitioner–Appellant,

v.

Jack DUCKWORTH, Respondent–Appellee.

No. 93–1835.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1994.

Decided July 21, 1994.

**1217**

I.

In September, 1986, the Indiana State Police questioned Lord about a missing person, Frederick Michael Thompson. The police became suspicious of Lord because he was one of the last people seen with Thompson and because Lord's account of the events of September 5–6, 1986, contained some general inconsistencies. On September 24, 1986, a county employee found Thompson's body, with a bullet wound to the back of the head, in a cistern beside an abandoned farmhouse.[1] Following this discovery, the police returned to further question Lord, at which time they advised him of his *Miranda* rights.

The following day, Lord voluntarily drove to an Indiana State Police Post to take a polygraph test. After Officer Fred Joseph Vetter. again informed Lord of his *Miranda* rights, Lord signed a polygraph waiver form and took the test at 1:20 p.m. Vetter was unconvinced by Lord's responses and continued to question him through the afternoon. At around 4:50 p.m., Vetter suggested that Lord speak directly with the county prosecutor, George Ankenbrand. As reflected in the record, their tape-recorded conversation went as follows:

MR. VETTER: ... If I could get George down here right now and tell him the truth, if I could get him down here and you were willing to tell him the truth, and I could cut him a deal, would you ... would you talk to him? If I could promise you ... if I could promise you ... if I could promise you he'd cut a deal with you, would you then talk and tell the truth? You better hurry. It's getting close to quitting time. It's 4:50. If I could get George down here and he'd cut you a deal ...

DEFENDANT: George?

MR. VETTER: George Ankenbrand. If he would come down here and you would finally tell the truth, if I can get him down here, would you tell the truth, if he'll cut you a deal? You got ten seconds to make

Patrick Stern (argued), Indianapolis, IN, for petitioner-appellant.

Wayne E. Uhl, Dist. Atty. Gen. (argued), Gen. Litigation, Indianapolis, IN, for respondent-appellee.

Before FLAUM and ROVNER, Circuit Judges, and WILLIAMS, District Judge.*

FLAUM, Circuit Judge.

In 1987, a jury in the circuit court of Gibson County, Indiana, convicted the petitioner, Charles Thomas Lord of murder, for which he received a sentence of eighty years imprisonment. After unsuccessfully appealing his conviction in the Indiana courts, Lord filed this petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. The district court denied Lord's petition. On appeal, Lord contends that police interrogators violated his right against self-incrimination and his right to obtain the assistance of counsel in two ways: (1) by continuing their interrogation after he requested counsel, and (2) by eliciting a confession through an illusory promise of leniency. We affirm.

* The Honorable Ann Claire Williams of the Northern District of Illinois is sitting by designation.

1. The detailed circumstances of the offense of which Lord was convicted are set forth in the opinion of the Indiana Supreme Court affirming the conviction, *Lord v. State,* 531 N.E.2d 207, 208–209 (Ind.1988), and need not be repeated here.

up your mind. This is the first and last offer.

DEFENDANT: What would happen?

MR. VETTER: Don't know. That's what I said, have to get him down here and you'd have to tell him the truth. You'd have to tell him all of what you're talking about. In other words, you'd have to tell him that you're involved somehow or another, that you state your involvement and you tell him the truth, he'll cut you a deal. Would you be willing to talk then?

DEFENDANT: Yeah.

MR. VETTER: Okay.

Immediately after this exchange, Officer Vetter left the room and Officer Michael Sibbitt entered the room saying to Lord, "Joe [Vetter] said that you might be able to clear some things up for us, said you wanted me to call George Ankenbrand to talk to him about it. Uh, I want, you know, I've got to know something, what to tell him. I don't know if I can call him ..." Lord then expressed his desire to return home later that night and his concern that his name and story would be printed in the newspaper. The conversation then continued as follows:

MR. SIBBITT: Well, let's don't worry about the newspaper you know. We'll ... we'll cross that bridge whenever we come to it. Well, you know, that's the least important thing. We just want to get some idea of what you're going to be able to tell us so I can get hold of the Prosecutor and talk to him, you know. I think that ... I think that you need to tell me something so I'll know what to call him, you know, some idea of what to tell him. Do you know what I mean?

DEFENDANT: I don't know, I just need to talk to somebody.

MR. SIBBITT: You can talk to me. I've known you a long time.

For the next eighty minutes, Lord did indeed talk. At 6:20 p.m., Officer Sibbitt again gave Lord his *Miranda* warnings and recorded a lengthy statement, including incriminating admissions. When the statement was completed, Lord agreed to assist the police in finding the gun that was used in the

crime. The following exchange then occurred:

DEFENDANT: I can't afford a lawyer but is there anyway I can get one?

MR. SIBBITT: Yeah. (Nods head yes.)

DEFENDANT: Is there anyway I can talk to some doctor or someone too?

MR. SIBBITT: Well, that will be up to the ... that will be up to the Court or up to your attorney....

DEFENDANT: The only thing I was wondering about is if I could go home tonight and somebody pick me up tomorrow ... (inaudible).

After being arrested and handcuffed, Lord accompanied the officers to the place where Thompson's body was found where they attempted, unsuccessfully, to locate the murder weapon. Lord spent the evening at the Gibson County Jail. The following morning, Officer Sibbitt and Detective Glenn Munnier visited Lord in his cell. Sibbitt verbally gave Lord a *Miranda* warning and asked if Lord had any additional information he wished to tell them. While Sibbitt went to retrieve a tape recorder, Lord asked Munnier if he would be able to obtain a lawyer when he went to court. Munnier replied that the court had a procedure for appointing lawyers. After Sibbitt returned, the officers again advised Lord of his rights and, for the third time, Lord executed a waiver of those rights. Lord then made further incriminating statements.

At trial, Lord moved to suppress all statements he made after asking if there was any way he could get a lawyer. After reviewing a videotape of the critical dialogue, the state trial court found Lord's request to be "equivocal and ambiguous, when viewed in the context in which it was made." Record at 33. In resolving this ambiguity, the court determined that Lord's statement appeared to be in the nature of queries regarding future access to counsel for a court hearing rather than a request for counsel at that time, and, thus was not "'... sufficiently emphatic to constitute an invocation of the right.'" *Id.* (citing *Heald v. State,* 492 N.E.2d 671, 676 (Ind.1986)).

The Indiana Supreme Court affirmed without deciding whether Lord had invoked his right to counsel. After explicating the trial court's ruling and stating grounds therefor, the Court first distinguished *Heald*[2] and then subjected Lord's contention to harmless error analysis:

> If we would assume for the sake of argument that appellant should not have been interrogated following his statement concerning counsel, we nevertheless would find that no reversible error occurred in view of the fact appellant had made a complete confession before inquiring about a lawyer. An examination of the statements made by appellant after that time clearly demonstrate that he made no additional statement nor did he contradict anything he had stated previously. Appellant suffered no prejudice by the interrogation that followed his inquiry concerning a lawyer.

*Lord,* 531 N.E.2d at 209.

After exhausting all state remedies, Lord filed a petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Section 2254 entitles a petitioner to relief only if he demonstrates that he is held in custody pursuant to a judgment of a state court "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Lord alleged that certain police officers violated his constitutional rights against self-incrimination and to the assistance of counsel[3] by (1) continuing their interrogation after he requested a lawyer, and (2) eliciting a confession through an illusory promise of leniency. In denying Lord's petition, the district court found the Indiana Supreme Court's harmless error analysis of Lord's request for counsel "persuasive" and rejected Lord's "illusory deal" claim because "there was no promise,

there was no 'deal,' and the only illusion is the petitioner's belief that the officers' statements amounted to one." Mem. Op. at 5–6. On appeal, Lord contends that both of these conclusions of law were erroneous.

## II.

■ Our review of a district court's denial of a petition for writ of *habeas corpus* is plenary. *United States ex rel. Partee v. Lane,* 926 F.2d 694, 700 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1230, 117 L.Ed.2d 464 (1992); *United States ex rel. Simmons v. Gramley,* 915 F.2d 1128, 1133 (7th Cir.1990). We presume the state court's findings of historical fact to be correct unless not fairly supported by the record, *Baskin v. Clark,* 956 F.2d 142, 145 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 109, 121 L.Ed.2d 67 (1992); however, we review *de novo* questions of law and mixed questions of law and fact. *See* 28 U.S.C. § 2254(d); *Brewer v. Aiken,* 935 F.2d 850, 855 (7th Cir.1991).

### A.

We turn first to Lord's claim that his statement "I can't afford a lawyer but is there anyway I can get one?" constituted a request for counsel, after which all police interrogation should have ceased.

■ As the Supreme Court recently stated in *Davis v. United States,* since *Miranda,* it has been clear that "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins." —— U.S. ——, ——, 114 S.Ct. 2350, 2354, 129 L.Ed.2d 362 (1994) (citing *Miranda* ). In *Edwards v. Arizona,*

---

**2.** In *Heald,* the defendant interrupted the police during the *Miranda* warnings to say she wanted to see an attorney. The policeman then indicated that he wished to finish giving the warnings, which he did. Heald was then asked if she wished to talk to counsel, but she specifically waived her right to counsel at that time. Here, by contrast, the supreme court found that Lord "at no time, pursuant to a direct question by the police, expressly waived his right to counsel following his statement [concerning counsel]." *Lord,* 531 N.E.2d at 209.

**3.** Here Lord invokes a right to counsel before responding to police interrogation, guaranteed by the Fifth·Amendment, rather than the Sixth Amendment right to counsel that attaches only after a suspect is formally charged with an offense. *See McNeil v. Wisconsin,* 501 U.S. 171, 176, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991); *Illinois v. Perkins,* 496 U.S. 292, 299, 110 S.Ct. 2394, 2398, 110 L.Ed.2d 243 (1990).

the Court had previously added a "second layer of prophylaxis for the *Miranda* right to counsel," *see McNeil v. Wisconsin*, 501 U.S. 171, 176, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991), enabling a suspect who has knowingly and voluntarily waived his right to counsel to request a lawyer at any time during a custodial interview, thereby shutting off additional questioning until a lawyer has been made available or the suspect himself initiates further communication with the police. 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). As the *Davis* Court emphasized, neither *Miranda* nor *Edwards* were mandated by the Constitution. —— U.S. at ——, 114 S.Ct. at ——. Rather, they stand as judicially-created safeguards designed to protect the right against compulsory self-incrimination, *see Michigan v. Tucker*, 417 U.S. 433, 443–444, 94 S.Ct. 2357, 2363, 41 L.Ed.2d 182 (1974), and "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *See Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990).

In *Davis*, the Court clarified what constitutes an invocation of the right to counsel during a custodial interview. Unwilling to create a "third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer," a majority of the Court held that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning *until and unless* the suspect *clearly* requests an attorney." —— U.S. at —— – ——, 114 S.Ct. at 2352 (emphasis added). In determining whether a reference to counsel is a "clear request", the Court noted the virtues of an objective inquiry that avoids difficulties of proof and provides guidance to officers conducting interrogations. *Id.* at ——, 114 S.Ct. at 2355. "Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* (internal citation omitted). The Court acknowledged that its approach might disadvantage some suspects who, for whatever reason, cannot articulate

clearly their desire for counsel, but found the requirement that a suspect knowingly and voluntarily waive his *Miranda* rights prior to questioning sufficient to protect the integrity of the interrogation process. *See id.* On the merits, the Court concluded that the petitioner's statement "Maybe I should talk to a lawyer" was not a request for counsel. Four Justices, concurring in the judgment only, advocated a rule that many state and lower federal courts had adopted—namely, "that when a suspect under custodial interrogation makes an ambiguous statement that might reasonably be understood as expressing a wish that a lawyer be summoned (and questioning cease), interrogators' questions should be confined to verifying whether the individual meant to ask for a lawyer." —— U.S. at ——, 114 S.Ct. at 2364 (Souter, J., concurring in the judgment).

In light of *Davis*, we must determine whether Lord's statement "I can't afford a lawyer but is there anyway I can get one?" was a "clear request" for counsel. As noted above, the state trial court labelled Lord's request for counsel "equivocal and ambiguous" and concluded that it was not "sufficiently emphatic to constitute an invocation of [the] right [to counsel]." Rec. at 33 (citing *Heald v. State*, 492 N.E.2d 671, 676 (Ind. 1986)). Ordinarily we treat a state court's conclusion as to whether a suspect invoked his *Miranda* rights as a finding of fact to which we owe deference when reviewing a federal *habeas corpus* petition. *Bobo v. Kolb*, 969 F.2d 391, 397 (7th Cir.1992); *see also Bryan v. Warden, Indiana State Reformatory*, 820 F.2d 217, 219 (7th Cir.), *cert. denied*, 484 U.S. 867, 108 S.Ct. 190, 98 L.Ed.2d 142 (1987); *Perri v. Director, Dept. of Corrections*, 817 F.2d 448, 451–452 (7th Cir.), *cert. denied*, 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987); *but see White v. Finkbeiner*, 611 F.2d 186, 189–190 (7th Cir. 1979) (stating that whether a statement was a request for counsel is a legal determination to which deference is not due), *rev'd. on other grounds*, 451 U.S. 1013, 101 S.Ct. 3000, 69 L.Ed.2d 385 (1981); *Robinson v. Borg*, 918 F.2d 1387, 1390 (9th Cir.1990) (same), *cert. denied*, —— U.S. ——, 112 S.Ct. 198, 116 L.Ed.2d 158 (1991). In this case, however,

neither the state supreme court nor the federal district court based their decisions on the trial court's *Miranda* findings. Though neither court quarreled with the characterization of Lord's request as "equivocal and ambiguous," both, apparently following what was then the majority rule in the states and lower federal courts, assumed for the sake of argument that the police should have ceased questioning Lord after his statement about counsel, but decided nonetheless that any error was harmless. *See Lord*, 531 N.E.2d at 209; Mem.Op. at 5. Because we are uncertain of the extent to which the Indiana Supreme Court agreed with the trial court's findings, we approach anew the question of whether Lord invoked his right to counsel.

An examination of the cases finding *unequivocal* requests for counsel leads to the conclusion that Lord's statement, on its face, was not sufficiently clear to fit in that category. *See e.g., Cannady v. Dugger,* 931 F.2d 752, 755 (11th Cir.1991) ("I think I should call my lawyer."); *Robinson*, 918 F.2d at 1391 ("I have to get me a good lawyer, man. Can I make a phone call?"); *Smith v. Endell,* 860 F.2d 1528, 1529 (9th Cir.1988) ("Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?"), *cert. denied,* 498 U.S. 981, 111 S.Ct. 510, 112 L.Ed.2d 522 (1990). Lord's statement lacked the clear implication of a present desire to consult with counsel that characterized the above statements. The context in which Lord made reference to a lawyer also supports the conclusion that any request for counsel was ambiguous, at best. Lord already had confessed in a lengthy, tape-recorded statement to the police and agreed to assist the police in searching for the murder weapon before the first mention of a lawyer. Furthermore, after Officer Sibbitt gave an affirmative response to Lord's question about obtaining a lawyer, Lord did not pursue the matter any further; rather, he asked about the possibility of also seeing a doctor and spending the night at his home. In these circumstances, we agree with the trial court's conclusion that Lord

most likely was asking for a clarification of his right to counsel at trial. Having twice been informed of his *Miranda* rights, and having executed written waivers of those rights on both occasions,[4] Lord was subject to questioning "unless and until" he *clearly* requested an attorney. *Davis,* —— U.S. at ——, 114 S.Ct. at 2352 (emphasis supplied). In this case, as in *Davis*, "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," *id.* at ——, 114 S.Ct. at 2352 (emphasis in original), not that he clearly was doing so. Accordingly, the police officers were under no obligation to stop questioning Lord, though it would have been entirely appropriate for them to clarify whether Lord in fact wanted a lawyer, either immediately or at trial. *See Davis,* —— U.S. at ——, 114 S.Ct. at 2352. The district court properly denied *habeas* relief on this ground.

### B.

■ With respect to Lord's claim that his confession was elicited by an illusory promise, the Indiana Supreme Court found it "obvious" that "the officer was not making any promise or offering to make a deal himself. He was merely asking appellant 'what if' the prosecutor would make a deal, would appellant then be willing to talk." *Lord,* 531 N.E.2d at 209. As the Court concluded, "When the entire transcript of the interrogation is examined, it becomes clear that the officers in this case did not induce appellant's statements by making improper promises." *Id.* In denying Lord's *habeas* petition, the district court strongly agreed with the state supreme court, concluding that "there was no promise, there was no 'deal,' and the only illusion is the petitioner's belief that the officers' statements amounted to one." Mem. Op. at 6.

■ It is well settled that the ultimate constitutional question of whether, under the totality of circumstances, a confession is admissible is a mixed question of fact and law

---

**4.** Lord does not contend that the waivers he executed, both orally and in writing, were not

knowing and voluntary.

subject to *de novo* federal review on *habeas,* while subsidiary questions that often require the resolution of conflicting testimony of police and defendant are factual questions on which the state court's findings are presumed conclusive if fairly supported in the record. *Miller v. Fenton,* 474 U.S. 104, 112, 117, 106 S.Ct. 445, 450, 453, 88 L.Ed.2d 405 (1985); *Bryan,* 820 F.2d at 219. This presumption of correctness applies equally to factual findings of state trial and appellate courts. *Sumner v. Mata,* 449 U.S. 539, 546, 101 S.Ct. 764, 768, 66 L.Ed.2d 722 (1981).

■ Of course, "[l]eading the defendant to believe that he or she will receive lenient treatment when this is quite unlikely is improper," *United States v. Long,* 852 F.2d 975, 978 (7th Cir.1988), but a defendant's mistaken belief about the scope of a police officer's promise does not render his confession involuntary. *Pharr v. Gudmanson,* 951 F.2d 117, 120 (7th Cir.1991). Viewing the exchange in this case as a whole, *supra* at 1217–18, we find adequate support for the state supreme court's finding that the police officers made no promise to Lord. Officer Vetter emphasized the contingent nature of his proposal by repeatedly using the word *if* and referring to the prosecutor as a necessary missing party who had the authority to make a deal. In other words, Vetter's proposition clearly entailed (1) "getting *him* down here," (2) for Lord to "tell *him* the truth," so that (3) *"he'd* cut you a deal." Furthermore, when Lord asked Vetter what would happen if the prosecutor came down to the station, Vetter replied "Don't know." Thus, it was made sufficiently clear from these statements that Vetter personally lacked the authority to make a deal.[5]

■ Finally, in conducting our plenary review of the voluntariness of Lord's confession, we follow the legal standard set out in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Under *Schneckloth,* we consider:

[t]he totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted.

*Id.* at 225–26, 93 S.Ct. at 2047 (citations omitted) (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)). On the particular facts of this case, we also may add inducement to the list of factors. *See Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (per curiam); *Long,* 852 F.2d at 977. Consideration of these factors leads to the inescapable conclusion that Lord's confession was voluntary. At the time of his interrogation, Lord was 35 years old and had experience with the criminal justice system by virtue of two prior felony convictions. He drove himself to the police station and on more than one occasion was advised of his *Miranda* rights and had executed written waivers of those rights. The police specifically told Lord that he was not under arrest and nothing in the record indicates that the officers either punished Lord or deprived him of food, sleep, or the opportunity to use the restroom. Finally, as noted above, the record amply supports the Indiana Supreme Court's finding that the police made no promises or untoward inducements in exchange for Lord's confession. On this record, our only hesitancy relates to the pressure placed on Lord by the manner in which

---

5. The statement "In other words, you'd have to tell him that you're involved somehow or another, that you state your involvement and you tell him the truth, *he'll cut you a deal,"* standing alone, might have been more troubling because it projects more certainty than perhaps is appropriate when discussing a proposed confession. Nevertheless, when considered in the context in which it was uttered, this single sentence does not undermine either (1) the conclusion that Lord should have understood that only the prosecutor could cut deals, or (2) the conclusion that no promise was in fact made.

the possibility of a deal with the prosecutor was broached: namely, the extreme time constraint ("You got ten seconds to make up your mind. This is your first and last offer.") and the insistence upon disclosure of potentially incriminating information ("I've got to know something, what to tell him. I don't know if I can call him...."). Though the totality of circumstances in this case weighs overwhelmingly in favor of finding a voluntary confession, we simply note that in a different case pressure of this sort could tip the balance critically toward involuntariness.

### III.

Neither of the arguments raised by Lord entitles him to relief. First, the Indiana trial court properly concluded that Lord's equivocal statement making reference to obtaining a lawyer was insufficient to constitute an invocation of the right to counsel. Second, Lord's confession was not the product of an illusory promise; rather, it was made voluntarily. Accordingly, the district court's decision to deny Lord's petition for writ of *habeas corpus* is AFFIRMED.