THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LYNDA SMITH, Defendant-Appellant.

Fourth District   No. 4—02—0075

Opinion filed July 30, 2003.

Daniel D. Yuhas and Robert N. Markfield, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Brown, State's Attorney, of Pontiac (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE APPLETON delivered the opinion of the court:

Defendant, Lynda Smith, was an inmate at Dwight Correctional Center. The State charged her with aggravated battery (720 ILCS 5/12—4(b)(6) (West 2000)) in that she "threw a liquid substance upon Randall Toliver, knowing [him] to be a correctional institutional employee who was engaged in the execution of his official duties." Smith waived a jury. After a bench trial, the trial court found Smith guilty of aggravated battery but also found that Toliver had "provoked" her. Although the trial court did not deem the provocation to be a defense to the aggravated battery, it took the provocation into account when imposing a sentence, a two-year consecutive prison term.

Smith appeals, arguing that the finding of provocation negated an essential element of the offense, namely, that Toliver was "engaged in the execution of any official duties." 720 ILCS 5/12—4(b)(6) (West 2000). We disagree. Even though Toliver wrongfully provoked Smith, the trial court found he had done so while performing his duties as a correctional officer. On its face, section 12—4(b)(6) of the Criminal Code of 1961 (720 ILCS 5/12—4(b)(6) (West 2000)) makes no exception for mere provocation. Therefore, we affirm the trial court's judgment.

## I. BACKGROUND

At the bench trial on November 26, 2001, the State called Toliver as its first witness. He testified that on January 3, 2000, he was employed as a correctional officer at Dwight Correctional Center. At 4:20 a.m., he was delivering breakfast to the inmates in the north hallway of the mental health unit, as it was his duty to do. He came to Smith's cell, cell No. 5, and pulled open the "chuckhole." The "chuckhole" was a metal door, approximately 4 by 12 inches, mounted in the thick glass door of the cell. It pulled down toward the correctional officer so the officer could hand items to the inmate in the cell. Behind the glass door were bars. Toliver handed a milk carton to Smith and turned to pick up a breakfast tray to hand to her also when a foul-smelling liquid sprayed out of the "chuckhole," dousing him "all over [his] uniform and [the] back of [his] head." He never actually saw Smith throw the liquid. Gagging, he went to the health care unit and changed his uniform. He felt insulted and provoked.

During cross-examination, Toliver admitted that although he was an employee of the Illinois Department of Corrections, he was not presently working. The State had brought criminal charges against him for making a personal long-distance call, at the State's expense, on a telephone in the prison. Apparently, his job depended on the verdict in the criminal case against him, which had not been handed down yet. No one had promised him anything for his testimony in the present case.

The State called another correctional officer, Robert Shelton, as its next witness. He testified he was on duty in the "panel" of the mental health unit when Smith assaulted Toliver. The "panel" was a kind of glass booth in the center of the unit, in which a correctional officer kept an eye on the wings and fielded telephone and radio calls. He saw Toliver delivering breakfast to Smith. He saw the "liquid come out of the chuckhole, hit [Toliver] center mass, which would be about the middle of the body[,] *** and *** spray[ ] clear up to the ceiling. *** [I]t had some velocity behind it." Toliver turned toward Shelton in amazement, as if to say, "I can't believe she did that." Dark stains of moisture were on his uniform. Shelton telephoned the shift sergeant, Ernest Jefferson, and told him what had happened.

Jefferson testified that when he came to the mental health unit and asked Smith what the problem was, she complained to him of a white powder on her french toast. It looked to Jefferson like powdered sugar. Jefferson asked her for the breakfast tray, but she refused to relinquish it. Instead, she scraped the white powder off the french toast and onto a paper towel and gave the towel to Jefferson, who in turn took it to his shift commander. Normally, the prison served french toast only with syrup, not with powdered sugar.

The State called, as its final witness, Luella Flynn, food service supervisor at Dwight Correctional Center. She confirmed that french toast was served, in the prison, without powdered sugar or any other white substance on it. The State rested.

The bench trial was continued until December 6, 2001, when Smith put on her case. She first called Linda Caldwell, an inmate who occupied a cell across the hall from her. Caldwell testified:

> "[Toliver] had started harassing [Smith] the night before[.] [Toliver] and Shelton had come down to her and was calling her names ***. And the next morning[,] when he came to her door with her tray ***[,] *** [h]e was messing with her, calling her names and stuff. *** And then I heard him tell her[:] *** [']I will bet you a hundred bucks you won't throw that on me.['] And *** the next thing I knew, I heard a noise[,] something splashing."

During cross-examination, Caldwell admitted she was in prison for forgery and deceptive practices.

Defendant next called Debbie Winters, a correctional lieutenant, who testified she had worked at Dwight Correctional Center since January 3, 2000, and had been acquainted with Toliver, in a professional capacity, for approximately a year. She did not have a high opinion of him. He was "very immature from what [she had] seen of him" and "flippant" in his interaction with inmates. "I feel he's not a very credible officer," she testified.

Defendant then took the stand. She testified the harassment began on January 1, 2000, when Shelton "kicked [her] food *** all the [way] from North 1 to North 5. And then[,] when he got to North 5, he opened [her] door, kicked it in to [her,] and called [her] a [']black nigger bitch.['] " She testified that Shelton and Toliver harassed her when she used the washroom, calling out to her, on the microphone, " 'Ol lady, ol lady, I know you up in there, ol lady.' "

According to defendant, Toliver came to her cell on January 3, 2000, and asked her, " 'Ol lady, you want your food?' " Smith replied, " 'Just give me what's in my bag,' " whereupon Toliver "play[ed] chicken back and forth" with her, holding the food out to her and withdrawing it when she reached for it. Finally, he handed her some cartons of milk and juice, which she threw onto the floor of her cell. He then handed her a breakfast tray. Opening it, she "noticed a white substance on the food tray." She asked him:

" 'What did you do with my food?'

He said, 'I bet you won't eat, because if you eat it, I guarantee you won't be here tomorrow.'

I said, 'What are you saying?' And then he just smiled. And then Officer Shelton, he got on the mike and then said, 'Ol lady, why don't you eat the food. Won't nobody miss you,' like that.

And so I demanded to see somebody. So I started telling them, 'I want to see somebody, I want to see somebody.'

Toliver came back to the door[,] opened my slide[,] gave me another milk[,] and stood in front of my doors as if he was posing[,] and told me he bet me $100, told me that I would throw the milk on him.

*** I took my foot[,] and I busted both of the containers open[,] and then he backed back as if I had [thrown] something out of the slot. Didn't nothing come out of the slot at all."

Defendant rested.

In rebuttal, the State offered evidence that Smith was serving a term of imprisonment for first degree murder and that she had been convicted of multiple counts of aggravated battery. For purposes of impeachment, the trial court received into evidence the murder conviction but rejected the convictions for aggravated battery. The State rested.

The trial court found Smith guilty of aggravated battery but told her: "My docket entry is going to show that there is as well evidence that you were provoked on this occasion by Officer Toliver." The docket entry of December 6, 2001, reads as follows:

"The [court] finds the [defendant] [g]uilty of [aggravated] [b]attery. The [court] further finds that the evidence shows that the [defendant] was provoked by the officer[;] however[,] the provocation was such as to not constitute a legal defense, and the [court] will take that into consideration at the time of sentencing."

At the sentencing hearing on January 16, 2002, the trial court told Smith: "The minimum prison sentence that I can sentence you to, Miss Smith, if you are sentenced to prison[,] is two years; and I am choosing to do that." The court ordered that the two-year term run consecutively to the terms of imprisonment Smith was already serving (her scheduled date of release was 2032).

This appeal followed.

## II. ANALYSIS

■ The parties disagree on the standard of review. The State understands Smith to be challenging the sufficiency of the evidence—specifically, the sufficiency of the evidence relating to a particular element of the offense: whether Toliver was "engaged in the execution of any official duties" when Smith threw the liquid at him. See 720 ILCS 5/12—4(b)(6) (West 2000). According to the State, we should look at the evidence in a light most favorable to the prosecution and ask whether any rational trier of fact could have found that element to be proved beyond a reasonable doubt. See *People v. Schott*, 145 Ill. 2d 188, 203, 582 N.E.2d 690, 697 (1991); *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

Smith insists, however, that "she does not challenge any factual finding made by the court." She argues that the element of being engaged in the execution of official duties "cannot be satisfied[,] as a matter of law[,] where the officer in question was engaged in harassing or provoking the defendant." According to her, this appeal requires us merely to interpret section 12—4(b)(6) (720 ILCS 5/12—4(b)(6) (West 2000))—specifically, the phrase "engaged in the execution of any official duties." We interpret statutes *de novo*. *People v. Maggette*, 195 Ill. 2d 336, 348, 747 N.E. 2d 339, 346 (2001).

To the extent we consider the meaning of "engaged in the execution of any official duties," we do so *de novo*. See *Maggette*, 195 Ill. 2d at 348, 747 N.E.2d at 346. This appeal requires us to do more, however, than interpret section 12—4(b)(6). Contrary to her assertion, Smith does indeed challenge a factual finding of the trial court—the finding that Toliver was engaged in the execution of his official duties. Smith

does not limit herself to statutory interpretation; she argues that the evidence of provocation disproved the State's allegation that Toliver was engaged in the execution of his official duties. Viewing the evidence in a light most favorable to the prosecution, we must ask whether any rational trier of fact could have found, beyond a reasonable doubt, that Toliver was engaged in the execution of his official duties even though he was, at the same time, deliberately and wrongfully provoking Smith. See *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

■ Section 12—4(b)(6) provides:

> "(b) In committing a battery, a person commits aggravated battery if he or she:
>
> * * *
>
> (6) Knows the individual harmed to be *** a correctional institution employee *** while such *** employee *** is engaged in the execution of any official duties ***." 720 ILCS 5/12—4(b)(6) (West 2000).

It is an essential element of the offense that the correctional institution employee was engaged in the execution of his or her official duties. See *People v. Bailey*, 10 Ill. App. 3d 191, 192, 293 N.E.2d 186, 186 (1973).

In *People v. Barrett*, 54 Ill. App. 3d 994, 370 N.E.2d 247 (1977), the Second District interpreted the statutory language "engaged in the execution of any official duties." An off-duty police officer, Ronald Lyerla, was moonlighting as a security guard at a department store. *Barrett*, 54 Ill. App. 3d at 995, 370 N.E.2d at 248. He had on his police uniform. *Barrett*, 54 Ill. App. 3d at 995, 370 N.E.2d at 248. As two shoplifters attempted to leave the store, Lyerla told them they were under arrest. *Barrett*, 54 Ill. App. 3d at 995, 370 N.E.2d at 248. One of the shoplifters, Lawrence Barrett, had a cast on his arm and struck Lyerla two or three times with it. The State charged Barrett with aggravated battery, and the jury found him guilty. *Barrett*, 54 Ill. App. 3d at 994-95, 370 N.E.2d at 247-48.

Then, as now, one of the statutory elements of aggravated battery was that the " 'officer [was] engaged in the execution of any of his official duties.' " *Barrett*, 54 Ill. App. 3d at 995, 370 N.E.2d at 248, quoting Ill. Rev. Stat. 1975, ch. 38, par. 12—4(b)(6). Barrett argued the evidence was insufficient to convict him of aggravated battery because Lyerla was off duty and acting in the course of his employment as a security guard. *Barrett*, 54 Ill. App. 3d at 995-96, 370 N.E.2d at 248.

■ In upholding the conviction, the Second District understood the phrase "engaged in the execution of any of his official duties" as describing an act rather than a status. *Barrett*, 54 Ill. App. 3d at 996,

370 N.E.2d at 249. The appellate court compared the phrase to one that appears in cases under the Civil Rights Act (section 1983) (42 U.S.C. § 1983 (1976)): acting "under the color of *** law." *Barrett*, 54 Ill. App. 3d at 996, 370 N.E.2d at 248. *Cf.* Black's Law Dictionary 266 (6th ed. 1990) (defining "color of law" as "pretense of law and includes actions of officers who undertake to perform their official duties"). The appellate court said:

" '[T]he fact that a police officer is on or off duty, or in or out of uniform[,] is not controlling. "It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law." ' " *Barrett*, 54 Ill. App. 3d at 996, 370 N.E.2d at 249, quoting *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975), quoting *Johnson v. Hackett*, 284 F. Supp. 933, 937 (E.D. Pa. 1968).

As a police officer, Lyerla had a duty, seven days a week, 24 hours a day, to maintain public order, and he was performing that duty when Barrett assaulted him. *Barrett*, 54 Ill. App. 3d at 996-97, 370 N.E.2d at 249. It was his act—apprehending a thief—that mattered, not his employment schedule. The State contends that Toliver likewise had a duty, as a correctional officer, to deliver breakfast to the inmates and he was performing that duty when Smith assaulted him.

Smith disagrees that Toliver was performing an official duty. She compares herself to the defendant in *Johnson*. In that case, an African-American sued a township and two police officers, Hackett and Thompson, under section 1983 for depriving him and other African-Americans of their civil rights. *Johnson*, 284 F. Supp. at 935. He alleged that "while in uniform and on patrol," Hackett and Thompson offered to fight a group of African-Americans, including Johnson, and called them racially derogatory names. *Johnson*, 284 F. Supp. at 936. The district court dismissed the complaint for failure to state a cause of action, because Johnson failed to allege that Hackett and Thompson had acted under the color of law. *Johnson*, 284 F. Supp. at 937. The court reasoned: "It is not alleged that the offer to fight was in any way related to the performance of police duties. *** No police duty or power of which I am aware can possibly be construed as clothing an officer with the authority of law to call anyone insulting names." *Johnson*, 284 F. Supp. at 937.

The present case bears a superficial resemblance to *Johnson* in that Toliver called Smith an insulting name ("ol lady") at the time of the assault. Two days earlier, Shelton had allegedly called her a racially derogatory name, but because the issue is whether Toliver was performing his official duties at the time of the assault, only events contemporaneous with the assault are relevant to the question of

guilt. Toliver's duties as a correctional officer did not include calling Smith insulting names, "playing chicken" with her breakfast tray, or intimidating her with the threat of poison. Nevertheless, *Johnson* is distinguishable from the present case because, in *Johnson*, the district court found that the police officers had been engaged *solely* in " 'their personal pursuits' " and had committed none of their acts "in the performance of any actual or pretended duty of a policeman." *Johnson*, 284 F. Supp. at 937, quoting *Screws v. United States*, 325 U.S. 91, 111, 89 L. Ed. 1495, 1508, 65 S. Ct. 1031, 1040 (1945).

In the present case, by contrast, Toliver committed his provocative acts while performing an actual duty of a correctional officer: delivering breakfast. In enacting section 12—4(b)(6), the legislature intended to provide enhanced protection to those subjected to special risks when performing public duties. *People v. Tripp*, 61 Ill. App. 3d 507, 510, 378 N.E.2d 273, 275 (1978). When delivering meals to inmates, correctional officers are subjected to special risks, such as having things thrown at them. The legislature intended to protect correctional officers from such risks.

Toliver performed his duty in a flippant, insulting, and provocative manner, but he was nevertheless performing a duty. We find no indication, in the text of section 12—4(b)(6), that the legislature intended correctional officers to become "fair game" if they provoked inmates while performing their duties. Provocation is no defense to aggravated assault. See *People v. Coleman*, 85 Ill. App. 3d 1020, 1026, 407 N.E.2d 832, 837 (1980) (although provocation reduces murder to manslaughter, it does not reduce aggravated battery to battery). Smith's remedy for the provocation was to file a grievance, not assault Toliver.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

TURNER and STEIGMANN, JJ., concur.