In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1479

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEANDRE R. HAMPTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 08-CR-20063—**Michael P. McCuskey**, *Judge.*

ARGUED MARCH 28, 2011—DECIDED MARCH 27, 2012

Before KANNE, SYKES, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* Deandre Hampton was arrested for unlawfully possessing a firearm as a felon after he discarded a loaded handgun during a foot chase with police in Kankakee, Illinois. At the jail Hampton signed a *Miranda* waiver and began to give a statement, but soon invoked his right to counsel. The Kankakee officers halted the interview and summoned a guard to take Hampton back to his cell. Hampton then changed his

mind and asked to speak with the officers without counsel present. The rest of the interview was audiorecorded.

After new *Miranda* warnings, the officers again asked Hampton if he wanted a lawyer. He replied, "Yeah, I do, but you . . . ." On hearing this the officers reminded him that they couldn't talk if he was asking for counsel. After a long pause, Hampton continued the conversation, hemming for a few minutes more before saying unambiguously that he wanted to continue without a lawyer. He then gave a statement denying the gun was his, saying it belonged to an acquaintance who was at the scene of the encounter with the police. Hampton admitted that he held the gun for a moment before the police arrived, but said he gave it back to the acquaintance and did not toss it during the foot chase.

Hampton was charged with one count of possession of a firearm by a felon and as an armed career criminal under the Armed Career Criminal Act ("ACCA"). *See* 18 U.S.C. §§ 922(g)(1), 924(e). He moved to suppress his custodial statement, claiming that the officers violated *Miranda* and *Edwards* by questioning him after he invoked his right to counsel. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Miranda v. Arizona,* 384 U.S. 436, 471-72 (1966). The district court denied the motion, holding that (1) the officers appropriately stopped the interview when Hampton asked for an attorney; and (2) Hampton himself reinitiated the interview and did not thereafter unequivocally invoke his right to counsel. Hampton's statement was admitted at trial, and a jury found him guilty.

At sentencing the district court designated Hampton as an armed career criminal based on three prior felony convictions, including an Illinois aggravated battery conviction for making "insulting or provoking" physical contact with a peace officer. This triggered a statutory minimum of 15 years, *see id.* § 924(e), a guidelines offense level of 33, *see* U.S.S.G. § 4B1.4(b)(3)(B), and an advisory guidelines range of 235 to 293 months. The district court settled on 252 months. Hampton appealed, challenging the denial of his suppression motion and his designation as an armed career criminal.

We affirm the conviction but vacate the sentence and remand for resentencing. The Kankakee officers did not violate the *Miranda/Edwards* rule. They honored Hampton's initial request for counsel and immediately stopped questioning him. Hampton himself reinitiated the interview, and the record supports the district court's conclusion that he did not thereafter make an unambiguous request for counsel as required by *Davis v. United States*, 512 U.S. 452, 459 (1994). But Hampton does not qualify as an armed career criminal. The Illinois crime of making insulting or provoking physical contact with a peace officer is not a violent felony under the ACCA.

## I. Background

Shortly after midnight on September 25, 2008, Deandre Hampton was standing with others outside a friend's apartment building on Wildwood Avenue in Kankakee when two police patrol cars drove by. As the squads approached, Hampton began to run into the apartment

building. Two officers gave chase and followed him into the building; the apartment manager had previously given them a key and permission to enter the building to patrol the common areas. Once inside, the officers saw Hampton running up a flight of stairs. One of the officers ran after him; as the officer reached the top of the first flight, he heard a thud on the second-floor landing above him as if something heavy was dropped on the floor. Hampton fled down a second staircase and ran into the other officer, who intercepted and tried to stop him. Hampton resisted, a scuffle ensued, and the two tumbled down the stairs. In the meantime the first officer retrieved a loaded semiautomatic handgun from the second-floor landing in the path of Hampton's flight. After Hampton was subdued and handcuffed, the officers took him to the hospital for treatment of minor injuries sustained in the tussle and then to the county jail.

At the jail Sergeant Peter Nicholos and Lieutenant Robin Passwater sought to question Hampton about the gun, first giving him *Miranda* warnings. Hampton acknowledged that he understood his rights, signed a waiver, and agreed to talk to the officers, but quickly changed his mind and requested a lawyer. The officers immediately halted the interview, and Nicholos left the room to summon a correctional officer to escort Hampton back to his jail cell. When the guard arrived, Hampton changed his mind again and asked to talk with the officers without an attorney present. At this point Nicholos and Passwater decided to audiorecord the remainder of the interview.

The interview resumed on tape.[1] After new *Miranda* warnings, the following exchange took place:

Passwater:    Alright. Earlier, you told us you—you—you were gonna talk about getting a lawyer or whatever . . . do you want a lawyer at this time?

Hampton:    Yeah, I do, but you . . .

Passwater:    Then I can't talk to you, alright? We can't— I can't take a statement from you if you want a lawyer.

Five seconds of silence followed. Then Hampton spoke:

Hampton:    But see, I'm askin' you is this gonna effect what's goin' on[?]

Passwater:    To be honest, I don't know—I mean . . .

Hampton:    What does—what does me—my attorney bein' present has to do with it—you know what I'm sayin'? That's what I . . . I don't . . . that's what ya'll don't understand . . . you makin' me [. . .]

Passwater:    If you want a lawyer then we need to stop the deal, okay?

Hampton:    See, I'm—

---

[1] The account that follows is based on the transcript of the interview and our review of the audiorecording, both of which are part of the record on appeal. Unless indicated otherwise, the quotes are presented as they appear in the transcript, with original punctuation, including ellipses.

Passwater:   It's one way or another. OK?

Hampton:   Yeah, come on man.

Passwater:   All right.

Nicholos:   Wanna go on?

Hampton:   Go ahead.

The officers thereafter tried to clarify whether Hampton wanted an attorney. Hampton asked again how an attorney's presence would affect his situation. The officers repeatedly explained that they could not continue the interview if Hampton wanted a lawyer. They also told him they could not promise him a deal and that the decision whether to have a lawyer present was his. When Hampton began venturing into the facts of the case, the officers again pressed him to clarify whether he wanted counsel:

Nicholos:   Again, do you want an attorney here or not? I mean, you asked for an attorney, we have to get that cleared up before we talk about anything. You know what I'm saying?

Hampton:   I think, I, I felt like it should have been an attorney here cause that's what I asked for. You know what I'm saying? Before we talked . . .

Nicholos:   Then we're done . . .

Hampton:   Yeah[.]

Nicholos:   You know what I'm saying? We're not going to sit here and play, you know . . .

Hampton: Naw, it's, I don't . . .

Nicholos: Cause you asked for an attorney.

Hampton: That's the whole point man, I don't want ya'll to think I'm playing with you or something.

Nicholos: No . . .

Hampton: I just want everything to see, my point, you know what I'm saying?

Nicholos: Right, I hear you, that's your right. That's why we read you those rights man. We're not going to think anything less of you because you want an attorney. That's your right. That's why we read you those rights man.

Hampton: Right.

Nicholos: You choose one, you choose one, man. No hard feelings. You know what I'm saying?

Hampton: I keep telling ya'll man, that that's not . . . that I told ya'll who's gun it is like . . .

Nicholos: I understand.

Hampton: I will give a written statement and testify, man.

Passwater: Oh, okay but we . . . once again, we got to know do you want an attorney or not? I mean yes or no? It's that . . .

> Hampton:    No, I don't want no attorney for right
>             now.

Hampton then gave the following statement to the officers: On the night of his arrest, he was hanging around with an acquaintance named "Mike-Mike" and a few others outside the apartment building on Wildwood Avenue. Shortly before the police arrived, Mike-Mike asked Hampton to hold his gun. Hampton initially agreed and briefly took Mike-Mike's gun, but then got scared and gave it back. When the police arrived in the neighborhood and approached the group outside the apartment building, everyone scattered. Hampton insisted it was Mike-Mike who carried the gun into the apartment building during the chase.

Hampton was charged with possession of a firearm by a felon as an armed career criminal in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). He moved to suppress his statement. The district court heard evidence on the motion, including the audiorecording and testimony from Nicholos, Passwater, and Hampton. The officers' account of what happened before the recorded portion of the interview differed slightly from Hampton's. The district court credited the officers' version, and Hampton does not challenge that part of the court's ruling on appeal.

As for the recorded portion of the interview, the court held that (1) Hampton himself reinitiated the conversation with the officers; (2) *Miranda* warnings were properly administered; and (3) Hampton's references to an attorney were ambiguous and did not amount to an

unequivocal request for counsel. The judge observed that Hampton was "looking for a deal and a way out," while the officers "were doing everything possible to comply with the law." Hampton's equivocation, the judge held, prompted the officers to try to clarify the situation; they gave Hampton "every opportunity to have a lawyer," but Hampton "continued to fish . . . for a deal." The judge concluded that "[w]hat Mr. Hampton needed to do and . . . did not do was make a clear, unambiguous assertion of his right to counsel to stop questioning. That didn't happen here." Accordingly, the court denied the motion to suppress.

The government introduced Hampton's statement at trial, playing the audiorecording for the jury. Hampton was convicted. The presentence report ("PSR") recommended that Hampton be classified as an armed career criminal based on three prior felony convictions—one for home invasion and two for aggravated battery. Hampton objected to the armed career criminal designation, arguing that one of his aggravated battery convictions—a 1999 Illinois conviction for making "insulting or provoking" physical contact with a peace officer—did not qualify as a violent felony under the ACCA or a crime of violence under the corresponding guidelines provision, U.S.S.G. § 4B1.1. The district court overruled the objection and accepted the PSR's recommendation. As a result Hampton was subject to a statutory minimum sentence of 15 years in prison and an advisory sentencing range of 235 to 293 months. The court imposed a sentence of 252 months, well above the statutory minimum and in the middle of the guidelines range. Hampton appealed.

## II.  Discussion

Hampton raises two issues on appeal: (1) his custodial statement was procured in violation of *Miranda* and *Edwards* and should have been suppressed; and (2) the Illinois aggravated-battery offense of making insulting or provoking contact with a peace officer is not a violent felony under the ACCA.

### A.  Hampton's Suppression Motion

Hampton argues that Nicholos and Passwater improperly questioned him in violation of *Miranda* and *Edwards* after he invoked his right to counsel and the district court therefore should have granted his motion to suppress. In an appeal challenging the denial of a motion to suppress, we review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Lee*, 413 F.3d 622, 624-25 (7th Cir. 2005).

To protect a suspect's Fifth Amendment right against compelled self-incrimination, custodial interrogations must be preceded by the familiar *Miranda* warnings, including a warning that the suspect has a right to an attorney at state expense during questioning; if the suspect invokes the right to counsel, he "is not subject to further interrogation . . . until counsel has been made available to him, unless [he] himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85; *see also Miranda*, 384 U.S. at 474. Questioning may continue, however, if the suspect's reference to counsel "is ambiguous or

equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994). In this situation, although "it will often be good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney," the police are not constitutionally obligated to ask clarifying questions. *Id.* at 461. But a request for counsel, unequivocal when made, cannot be rendered equivocal by continued questioning. *Smith v. Illinois*, 469 U.S. 91, 100 (1984). Put differently, a suspect's later statements in response to continued questioning cannot be used to undermine an earlier unambiguous invocation of the right to counsel. *Id.*

Here, most of the evidentiary facts relevant to the district court's suppression decision were captured on audiotape and are not subject to dispute. After initially signing a *Miranda* waiver, Hampton changed his mind and invoked his right to counsel, which was honored; questioning immediately ceased and the officers arranged for Hampton to be returned to his cell. When the guard arrived, Hampton changed course and reengaged the officers, saying he wanted to proceed without counsel. The officers properly started anew with fresh *Miranda* warnings. This is where the audiotape begins, and we have reproduced the most important parts of the transcript above. The parties disagree about the legal significance of what was said during the recorded part of the interview. Did Hampton *unequivocally* re-invoke his right to counsel?

Hampton focuses on two particular statements he made on the recording. After Passwater administered new *Miranda* warnings and asked Hampton whether he wanted a lawyer, he responded, "Yeah, I do, but you . . . ." Hampton contends that this statement was an unambiguous request for counsel. The government disagrees, defending the district court's contextual interpretation. The government maintains that the use of the qualifying word "but" when considered in light of Hampton's prior equivocation would lead a reasonable officer to conclude only that Hampton *might* be invoking his right to counsel, not that he clearly was doing so.

The government is right to consider Hampton's statement in light of the circumstances in which it was made. Whether a suspect clearly invoked his right to counsel is an objective inquiry. *Davis,* 512 U.S. at 458-59; *United States v. Martin,* 664 F.3d 684, 688 (7th Cir. 2011); *United States v. Shabaz,* 579 F.3d 815, 818 (7th Cir. 2009). We have emphasized that the "analysis does not end with words alone; . . . we also consider the circumstances in which the statement was made." *Shabaz,* 579 F.3d at 819; *see also Lord v. Duckworth,* 29 F.3d 1216, 1221 (7th Cir. 1994) ("[T]he context in which [the suspect] made reference to a lawyer also supports the conclusion that any request for counsel was ambiguous . . . .").

Here, Hampton had already signed a *Miranda* waiver and agreed to talk to the officers without a lawyer, only to change his mind just as the interview was getting underway. The officers immediately stopped the inter-

rogation and summoned a guard to take Hampton back to his cell. When the guard arrived, Hampton changed his mind again and reinitiated the interview, asking to talk to the officers without an attorney present. The officers paused and took the precautionary step of bringing in audiorecording equipment. When Passwater renewed the *Miranda* warnings, Hampton hesitated again and appeared to have another change of heart. Based on this pattern of equivocation and because Hampton's reference to a lawyer used the hedge word "but," we agree with the government that a reasonable officer would have understood only that Hampton *might* want an attorney present, not that he was clearly invoking his right to deal with the officers only through counsel. *See, e.g., Davis*, 512 U.S. at 455 (the statement "[m]aybe I should talk to a lawyer" was not an unambiguous request for counsel); *Shabaz*, 579 F.3d at 819 (the question "am I going to be able to get an attorney" was not an unambiguous request for counsel); *Lord*, 29 F.3d at 1221 (the question "I can't afford a lawyer but is there anyway I can get one?" was not an unambiguous request for counsel); *United States v. Buckley*, 4 F.3d 552, 558-59 (7th Cir. 1993) (the statement "I don't know if I need an attorney" was not an unambiguous request for counsel).

Even if Hampton's statement "Yeah, I do, but you . . ." was definite enough to constitute an unambiguous request for counsel (and considering the context, we do not think it was), the record is clear that no interrogation occurred until Hampton *himself* resumed the conversation. Passwater immediately told Hampton that

they could not talk to him if he was asking for a lawyer. A long moment of silence followed in which neither officer asked a question or said anything further. A full five seconds passed before Hampton reengaged the officers by asking them how the presence of an attorney would affect his situation. Once he did this, the officers were permitted to resume questioning, although the record reflects that what happened next was not an interrogation at all but an effort to clarify Hampton's intent. Though not constitutionally required, this is just what the Supreme Court recommends that officers do in this situation. *See Davis*, 512 U.S. at 461.

The next several minutes of the audiotape consists of putative bargaining by Hampton. He is plainly trying—as the district court aptly put it—to "fish . . . for a deal." For their part, the officers continued to press him for a decision about counsel. When he started to veer into the facts of the case, the officers stopped him and again tried to clarify whether he wanted an attorney. In response Hampton said, "I think, I, I felt like it should have been an attorney here cause that's what I asked for." This is the second statement that Hampton emphasizes. Considered in context, however, this statement, like the earlier one, is not an unambiguous request for counsel.

By this point in the encounter, Hampton had twice mentioned an attorney only to change his mind and reinitiate the conversation with the officers. The officers scrupulously honored Hampton's request for counsel that occurred soon after his initial *Miranda* waiver; his

first reference to counsel was not unclear. Hampton then changed his mind and asked to talk to the officers without an attorney. Wary, the officers began recording the conversation. Almost immediately after new *Miranda* warnings, Hampton again mentioned a lawyer, but this time he equivocated. Again the officers stopped the interview, reminding him that they couldn't talk any further if he was asking for counsel. Hampton paused to think about it, then plunged back in and tried to take control of the situation, asking the officers how a lawyer would affect his situation. As he searched for a deal, they took another stab at clarifying his intent. When he strayed into the facts of the case, they stopped him and insisted on a clarification of his desire for counsel before proceeding. Under these circumstances, Hampton's statement "I think, I, I felt like it should have been an attorney here cause that's what I asked for" was not definite enough to unambiguously invoke the right to counsel. Instead, a reasonable officer would have understood that Hampton might want a lawyer, but also might want to proceed without one.

   In short, we agree with the district court that Hampton did not "make a clear and unambiguous assertion of his right to counsel to stop questioning." *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005). The officers' effort to obtain clarification—eventually resulting in a firm "no" from Hampton that he did not want counsel present—was appropriate and consistent with the "good police practice" endorsed by the Supreme Court in *Davis*. Hampton's motion to suppress was properly denied.

**B. Armed Career Criminal Designation**

Hampton also challenges the district court's determination that his prior conviction for making insulting or provoking contact with a peace officer, a form of aggravated battery in Illinois, is a "violent felony" under the ACCA and a "crime of violence" in the parlance of the sentencing guidelines, *see* U.S.S.G. § 4B.1.2(a). We review this legal ruling de novo. *United States v. Smith*, 544 F.3d 781, 783 (7th Cir. 2008).

The ACCA enhances a sentence for being a felon in possession of a firearm if the defendant has three prior convictions for a "violent felony." *See* 18 U.S.C. § 924(e). A "violent felony" is defined as a crime punishable by a year or more in prison that

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

> (ii) is burglary, arson, or extortion, involves the use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .*

*Id.* § 924(e)(2)(B) (emphasis added). A defendant's status as an armed career criminal also enhances his offense level and criminal history category under the sentencing guidelines. *See* U.S.S.G. § 4B1.4.

Hampton concedes that two of his prior convictions are violent felonies: his Illinois convictions for home invasion and for aggravated battery for causing bodily harm to a peace officer. He argues that his 1999 aggravated-battery conviction—for making "insulting

or provoking" physical contact with a peace officer—does not qualify as a violent felony.

Everyone agrees that if this conviction is to be counted as an ACCA predicate, it must satisfy the so-called "residual clause" of the violent-felony definition, which sweeps in crimes that "otherwise involve[] conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). The Supreme Court requires that we use a categorical approach, which is to say we examine only "'whether the *elements of the offense* are of the type that would justify its inclusion within the residual provision, without inquiring into the specific conduct of this particular offender.'" *Sykes v. United States*, 131 S. Ct. 2267, 2272 (2011) (quoting *James v. United States*, 550 U.S. 192, 202 (2007)). The categorical approach assesses the risk of injury in the generic offense as generally committed. *Id*. at 2275. "[A] crime involves the requisite risk when 'the risk posed by [the crime in question] is comparable to that posed by its closest analog among the enumerated offenses' "—namely, burglary, arson, extortion, or crimes involving the use of explosives. *Id*. at 2273 (quoting *James*, 550 U.S. at 203); *see also Begay v. United States*, 553 U.S. 137, 144-45 (2008); *United States v. Dismuke*, 593 F.3d 583, 589 (7th Cir. 2010).

Under Illinois law a person commits battery "if he intentionally or knowingly without legal justification and by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILL. COMP. STAT. 5/12-3(a) (1993). Simple battery is treated as a

felony aggravated battery if one of several enumerated aggravating factors is present. *See id.* 5/12-4(b)(6). Here, Hampton was convicted in 1999 of the simple battery form of the offense—more specifically, the "insulting or provoking" contact form—but the crime was elevated to felony aggravated battery because the victim was "a peace officer . . . engaged in the execution of . . . official duties." *See id.*

We have already addressed the related question whether the insulting-or-provoking contact form of the Illinois battery offense is a crime of violence under the career-offender sentencing guideline when the offense is a felony aggravated battery because the victim is a pregnant woman.[2] *See United States v. Evans*, 576 F.3d 766 (7th Cir. 2009). In *Evans* we held that making insulting or provoking contact with a pregnant woman is not a crime of violence because: (1) the act of making insulting or provoking contact—which might include giving an unwanted kiss and often includes spitting—does not generally create a risk of injury; and (2) there was no evidence that the typical crime of making insulting or provoking contact with a pregnant woman is violent. *Id.* at 768-69. In another case—albeit a nonprecedential order—we held that "[t]he presence of a different ag-

---

[2] The definition of "crime of violence" in the career-offender guidelines is almost identical to the definition of "violent felony" in the ACCA; therefore, our caselaw interpreting the two definitions is interchangeable. *United States v. Templeton*, 543 F.3d 378, 380 (7th Cir. 2008).

gravating factor—a public place rather than a pregnant victim—does not change *Evans*'s conclusion that insulting or provoking contact, in the ordinary case, is not violent." *United States v. Johnson*, 365 F. App'x 3, 5 (7th Cir. 2010).

At issue here is whether the presence of a different aggravating factor—a peace-officer victim—changes the analysis. *Evans* left open the possibility that other versions of the Illinois aggravated-battery offense might be a crime of violence (or a violent felony) if the crime as generally committed is violent and carries the required degree of risk of physical injury. Here, the district court held that when committed against a peace officer, the offense of making insulting or provoking physical contact generally creates a risk of injury comparable to the risk created by the enumerated offenses in the residual clause.

To support this conclusion, the district court relied primarily on statistics submitted by the government regarding the incidence of injury to police officers during assaults. These statistics—compiled by the Department of Justice ("DOJ")—show that in 2008, 26% of reported assaults on law-enforcement officers resulted in injuries to the officer—a rate 13 times higher than the 2% injury rate for burglaries, a crime specifically listed in the residual clause. But while statistics can sometimes usefully inform the analysis, *see, e.g.*, *Sykes*, 131 S. Ct. at 2274-75, the DOJ report is not helpful here. Its methodology section states:

> Law enforcement agencies report to the [crime-reporting] [p]rogram the number of assaults resulting

in injuries to their officers or instances in which an offender used a weapon that could have caused injury or death. Agencies record other assaults only if they involved more than verbal abuse or minor resistance to an arrest.

In other words, the report focuses on *serious* physical assaults on officers, which would likely be charged as a bodily injury battery under the Illinois battery statute. The DOJ report specifically excludes nonserious assaults; only assaults that involved "more than verbal abuse or minor resistance to an arrest" were reported. As such, the DOJ report does not paint an accurate picture of the frequency of officer injuries resulting from "insulting or provoking" contact batteries involving law-enforcement officers as victims.

The government also analogizes this form of battery to felony vehicular flight, which the Supreme Court held to be a violent felony under the ACCA. *See Sykes*, 131 S. Ct. at 2277. The Court in *Sykes* observed that even at low speeds, vehicular flight is dangerous to pursuing officers, other motorists, and bystanders because the officers may be compelled to use countermaneuvers to subdue the fleeing vehicle. *See id.* at 2273-74. By analogy, the government argues that even a light insulting or provoking contact with a peace officer has the potential to induce a counterreaction that poses a serious risk of injury to the officer or others.

We find this comparison inapt. Setting aside the orders-of-magnitude difference between the force of a fleeing vehicle and that of, say, a poking finger, vehicular flight

is inherently more risky than making insulting or pro-voking contact with an officer. The former offense, as generally committed, necessarily involves resistance to the officer's authority by the use of a dangerous instru-mentality—a fleeing vehicle—and it induces an escalated reaction from the pursuing officer that inherently carries heightened risk of injury to others. In contrast, the insulting-or-provoking-contact offense, though it may require a certain bravado in the face of authority, does not entail resistance of the sort that ordinarily induces an escalated response from the officer that puts the officer or others at a similar serious risk of injury. *See, e.g.*, *People v. Smith*, 794 N.E.2d 408, 409-11 (Ill. App. Ct. 2003) (affirming conviction under the insulting-or-provoking-contact provision for throwing milk through cell door at guard); *People v. Peck*, 633 N.E.2d 222, 223-24 (Ill. App. Ct. 1994) (affirming conviction for spitting on a police officer); *see also Garcia-Meza v. Mukasey*, 516 F.3d 535, 538 (7th Cir. 2008) (suggesting that someone could be convicted for crumpling up parking ticket and throwing it at the issuing officer's shoes).

Finally, the government argues that a person who is brazen enough to make insulting or provoking physical contact with a peace officer is also likely to violently resist arrest. But the inquiry under the residual clause is not whether *some* instances of the crime pose a serious risk of injury to others. Rather, our focus is on the generic crime as ordinarily committed—that is, whether *most* instances of the crime present the required degree of risk. *See Dismuke*, 593 F.3d at 594. Applying the categorical approach, we conclude that the Illinois

aggravated-battery offense of making insulting or provok-ing contact with a peace officer does not qualify as a violent felony and is therefore not an ACCA predi-cate. Because the district court's determination to the contrary enhanced Hampton's sentencing range,[3] we vacate the sentence and remand for resentencing.

AFFIRMED in part,
VACATED in part, and REMANDED.

---

[3] Without the armed career criminal designation, the 15-year mandatory minimum drops out, and the statutory maximum becomes ten years. *See* 18 U.S.C. § 924(a)(2). Hampton's guide-lines range thus becomes 120 months. *See* U.S.S.G. § 5G1.1.