2025 IL App (1st) 232039-U

No. 1-23-2039

Third Division
September 17, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 22 CR 07625 |
| v. | ) | |
| | ) | The Honorable |
| KENDELL CARR, | ) | Stanley J. Sacks, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |
| | ) | |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Martin and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1        *Held:*  Defendant's conviction for aggravated battery to a peace officer is affirmed, where a rational trier of fact could have found beyond a reasonable doubt that defendant committed a battery while knowing that the victim was a peace officer engaged in the performance of his official duties.

¶ 2        After a jury trial, defendant Kendell Carr was convicted of aggravated battery to a peace officer (720 ILCS 5/12-3.05(d)(4) (West 2022)), and was sentenced to 30 months' probation, in connection with an incident in which he spat on a police officer during the course of a traffic stop. On appeal, defendant contends that the State failed to prove him guilty of the offense

where it failed to establish beyond a reasonable doubt (1) that the officers were performing an official duty in good faith and (2) that defendant was aware they were doing so. Accordingly, defendant claims that his conviction should be reduced to simple battery. For the reasons set forth below, we affirm.

¶ 3                                   BACKGROUND

¶ 4         On May 9, 2022, police officers on routine patrol observed defendant's vehicle reversing down a one-way street and briefly double-parking in front of a house before driving down an alley. The officers followed the vehicle down the alley, where it parked on a concrete pad behind the same house. The officers performed a traffic stop with respect to the traffic violations, which escalated to the point that additional officers were called to the scene, resulting in defendant being bodily removed from his vehicle and carried to the police vehicle. While defendant was in the police vehicle, he spat on one of the officers.[1] Defendant was charged with one felony count of aggravated battery to a peace officer, and the matter proceeded to a jury trial. At trial, the State presented the testimony of two of the police officers involved in the arrest, while the defense presented the testimony of defendant and his mother.

¶ 5                                   *Officer Hureta*

¶ 6         Chicago police officer Emmanuel Hureta testified that, on May 9, 2022, at approximately 2:45 p.m., he was on routine patrol with his partner, Officer Moreno,[2] in an unmarked police vehicle. Near 101st Street and South Normal Avenue, he observed a black Mazda sedan reversing down Normal Avenue, which was a one-way street; the officers' vehicle was "a few

---

[1] While defendant claimed at trial that he did not knowingly spit on the officer, he concedes on appeal that the State presented sufficient evidence to prove the issue beyond a reasonable doubt. Accordingly, the question of whether defendant spat on the officer is no longer in dispute.

[2] Moreno's first name is not contained in the record on appeal.

feet away," behind the Mazda. The Mazda then came to a complete stop, double-parking on the street. Hureta "attempted to curb the vehicle" to initiate a traffic stop, but as the police vehicle approached, the Mazda drove away. Hureta followed as the Mazda turned down a nearby alley and parked "in the driveway" behind a residence. Hureta and Moreno then exited the police vehicle and approached the Mazda, with Hureta approaching the driver's side and Moreno approaching the passenger's side. Hureta testified that the reason for the traffic stop was due to "[u]nsafely backing and double parking on the street."

¶ 7    As Hureta approached the Mazda, he observed the driver open the door and look outside the vehicle at the police; the door remained open for some time. When Hureta reached the driver's side door, he observed two occupants inside the Mazda: the driver—who he identified in court as defendant—and a "really young" child in the backseat, who was identified as defendant's daughter. Hureta announced that he was a police officer and the reason for the traffic stop, and defendant "became irate and angry." Hureta asked defendant for his driver's license and insurance, which he provided, and Hureta returned to the police vehicle to conduct a name check on the vehicle's computer system; the name check ultimately did not reveal any problems with defendant's documentation. While Hureta conducted the name check, Moreno remained near the Mazda, next to the rear passenger's side window.

¶ 8    When Hureta completed the name check, he returned to the Mazda, and Moreno approached him, indicating that he had observed defendant making "furtive movements" toward the center console, which defendant had previously opened at the beginning of the traffic stop. Hureta asked defendant "if he was okay[,] at which time he became irate again and began yelling." Hureta asked defendant to lower the windows of the Mazda, and defendant lowered the passenger's side window slightly. He asked defendant to lower it further, and

defendant lowered it a bit more, but "[n]ot enough for my partner to see inside the vehicle." Hureta then asked defendant to exit the vehicle, but defendant refused. Hureta repeated his demands several times, but defendant continued to refuse to exit the vehicle. Defendant began making calls on his cell phone, after which Hureta again asked him to exit the vehicle and defendant again refused.

¶ 9     Hureta then "grabbed" defendant's arm, and, in response, defendant held on to the steering wheel tightly and "stiffen[ed]" his body; Hureta testified that he grabbed defendant's arm to place him in custody "[b]ecause we felt we were about to receive a battery, and he was obstructing our command" by not following Hureta's requests. Defendant's mother arrived on the scene, and Hureta addressed her, asking her to obtain her son's cooperation. Defendant and his mother "exchanged words" and defendant indicated that he was not going to comply with the officers' demands.

¶ 10     Hureta and Moreno approached the driver's side of the Mazda and demanded several times for defendant to exit the vehicle, but defendant did not comply. Moreno then placed handcuffs on one of defendant's wrists and, in response, defendant grasped the steering wheel and stiffened his body. Two other officers, including Officer John Szajerski, then arrived at the scene; Hureta had requested additional officers as backup to "[d]eescalate the situation" due to defendant's behavior. The officers approached the driver's side of the vehicle, where Moreno was attempting to remove defendant from the vehicle, and Szajerski and Moreno "assist[ed] the defendant out of the vehicle."

¶ 11     Once defendant was outside the vehicle, he "dropped his dead weight" to the ground and pulled his arm toward the center of his body. Defendant was then "taken to the squad car" and,

4

when Szajerski placed defendant inside the police vehicle, defendant "spit on Officer Szajerski's shoulder."

¶ 12        Hureta testified that he was wearing a body-worn camera at the time of the events in question, and that it was activated and working properly. Portions of the video from the body-worn camera were admitted into evidence and published to the jury.

¶ 13        The video, which is contained in the record on appeal, is slightly under eight minutes long and contains no audio.[3] It depicts Hureta exiting an unmarked police vehicle which is parked on the street, partially blocking a concrete pad located in the rear of the backyard of a house. The backyard is fenced with a chain-link fence, but the gate is open, permitting a black Mazda to park on the concrete. Immediately after Hureta exits the vehicle, the Mazda's driver's side door opens, and defendant's head appears; the driver's side door appears to remain open during the entirety of the video. While there is no audio, it appears as though Hureta is addressing defendant as he approaches, pointing toward the front of the house—where defendant allegedly double-parked—and defendant responds. While Hureta and defendant continue speaking, defendant hands Hureta his driver's license and other documentation; a car seat can be observed in the backseat of the vehicle, on the passenger's side, and Moreno is standing outside the vehicle next to the rear passenger's side door.

¶ 14        Slightly less than one minute into the traffic stop, Hureta returns to the police vehicle to perform a name check. Approximately one minute later, Hureta again approaches the Mazda; on his way, Moreno meets him and says something to him. After speaking with Moreno, Hureta returns to the driver's side of the vehicle and Moreno stands next to the front passenger's side door. Hureta makes a gesture for defendant to lower the front passenger's side window, and it

---

[3] As we describe later, a different State's exhibit contains the same video with audio.

lowers slightly. He appears to request that it be lowered further, and the window is opened approximately a third of the way. Defendant and Hureta continue conversing, while Moreno is crouched to look through the front passenger's side window. During the conversation, defendant appears to become agitated.

¶ 15    Approximately three and a half minutes into the traffic stop, Hureta makes a gesture which appears to indicate that defendant should exit the vehicle. Instead, defendant makes a phone call on his cell phone. Hureta again makes a similar gesture, and defendant again appears to make a phone call. Hureta addresses defendant and, while they converse, Moreno reaches through the passenger's side window and opens the door, leaning one arm on the top of the front passenger's seat while his other hand rests on his firearm, where it remains for approximately the next minute. When defendant observes Moreno touching his firearm, he immediately takes objection, gesturing to the backseat—where his young daughter is seated—and placing both hands in front of him near the steering wheel. Hureta repeatedly makes gestures indicating that defendant should exit the vehicle, and defendant continuously shakes his head, holding both hands on the steering wheel. Defendant raises one hand, which has been holding his cell phone, and speaks animatedly into the phone. During the conversation, defendant looks at each officer, appearing to read their nametags to relay over the phone.

¶ 16    Six minutes into the video, Moreno moves from the Mazda into the street, appearing to look down the street, then again approaches the Mazda on the passenger's side. Hureta and defendant continue to speak to each other, when a woman appears from the street and stands near the police vehicle. Hureta appears to address her, ordering her to stay back, and the woman responds. Defendant then sticks his head out of the vehicle and speaks to her. At that point, Hureta, defendant, and the woman all appear to be speaking simultaneously. Defendant leans

out of the vehicle to yell something at her, and Moreno reaches into the vehicle through the open passenger's side door, appearing to remove the keys from the ignition. Moreno then approaches the woman, who is holding a cell phone, and speaks with her. She walks to the end of the concrete, looking down the street as Moreno approaches the driver's side of the Mazda, and additional police officers soon arrive at the scene. Moreno removes a pair of handcuffs from his belt and motions to the other officers. As the video ends, Moreno is holding the handcuffs while Hureta stands near the driver's side door, another officer stands at the passenger's side door, and a fourth officer is approaching.

¶ 17                                    *Officer Szajerski*

¶ 18      Chicago police officer John Szajerski testified that, on May 9, 2022, at approximately 2:45 p.m., he was on routine patrol with two other officers when he received a call that a fellow officer needed assistance with respect to a traffic stop; while Szajerski was in an unmarked police vehicle, he was in full police uniform. When he arrived at the address, he observed officers performing a traffic stop, with defendant seated inside the vehicle and an infant in the rear passenger's seat. When he approached the vehicle, Szajerski observed that defendant was "very agitated" while Moreno was speaking to him and "trying to de-escalate him, trying to get him to calm down and just have a normal conversation with him." Moreno attempted to convince defendant to exit the vehicle of his own volition, but defendant refused to do so, so Moreno placed one handcuff on defendant's wrist, at which point defendant "tensed up his body, grabbed onto the steering wheel and refused to move."

¶ 19      Szajerski attempted to remove defendant from the vehicle, placing his arm under defendant's shoulder to guide him out, but defendant "grab[bed] on the steering wheel and held on." Eventually, Szajerski and Moreno were able to pull him from the seat; momentum caused

7

the officers to fall backward and caused defendant to fall to the ground. While defendant was on the ground, Szajerski noticed a pair of scissors in defendant's front pocket, so he helped place defendant onto his stomach, where Szajerski and the other officers placed defendant in handcuffs. After defendant was handcuffed, Szajerski assisted defendant to his feet, and he and two other officers walked defendant to one of the police vehicles. While they were walking to the police vehicle, defendant was "still agitated, screaming, yelling profanities," and, at one point, threw himself to the ground. Szajerski and the other two officers each grabbed defendant by a limb and carried him to the police vehicle. When they reached the police vehicle, Szajerski placed defendant inside the vehicle. As he was guiding defendant's legs into the vehicle, Szajerski "heard a loud spitting noise, at which point I looked down and realized that I had spit and saliva on my uniform," just above his right shoulder.

¶ 20        Szajerski testified that he was wearing a body-worn camera at the time of the events in question, and that it was activated and working properly. Portions of the video from the body-worn camera were admitted into evidence and published to the jury.

¶ 21        Szajerski's body-worn camera video, which is contained in the record on appeal, is in the form of two clips, one which is slightly under four minutes long and one which is 13 seconds long; neither clip contains audio.[4] The first clip begins with Szajerski standing near the rear driver's side window of the Mazda; Hureta is standing next to the driver's door, which is open, and an infant can be observed in a car seat on the rear passenger's side. Hureta and defendant speak for approximately 30 seconds, then Hureta leaves and Moreno, holding handcuffs in one hand, takes his place. Moreno speaks to defendant, who becomes increasingly agitated.

---

[4] As with Hureta's video footage, a different State's exhibit contains the same video with audio.

¶ 22 After approximately one minute, Moreno reaches into the Mazda and grabs defendant's left hand, placing a handcuff on it. Simultaneously, Szajerski reaches into the vehicle and places his arm under defendant's left armpit. Defendant does not leave the vehicle but lowers his head and holds on to the steering wheel. The officers then pull him out of the vehicle and defendant falls to the ground, losing his glasses; a pair of scissors can be observed in his front pocket and are removed by one of the officers. Defendant is placed onto his stomach and handcuffed by multiple officers, after which Szajerski and another officer assist him to his feet. Szajerski then escorts defendant to the alley and down several houses, to where a police vehicle is parked. As they are passing a different vehicle, defendant appears to make contact with that vehicle, then falls to the ground. Szajerski and other officers then pick defendant up and carry him the rest of the way to the police vehicle. Defendant is placed head-first into the police vehicle, and the first video clip ends with Szajerski swinging defendant's legs into the vehicle.

¶ 23 The second clip, which is only 13 seconds long, begins where the first video ended, with Szajerski placing defendant's legs into the police vehicle. Defendant then sits up inside the vehicle as Szajerski closes the door.

¶ 24 *Yolanda Harris*

¶ 25 After the State rested and a motion for directed verdict was denied, Yolanda Harris, defendant's mother, testified on his behalf that, on May 9, 2022, defendant resided at an address on the 10100 block of South Normal Avenue with his girlfriend and seven-month-old daughter. Harris was present when the officers removed defendant from the Mazda and observed that he was placed facedown on the ground before being bodily moved to the police vehicle and further observed that, at some point, defendant lost his glasses.

¶ 26                                    *Defendant*

¶ 27          Defendant testified that, on the afternoon of May 9, 2022, he had just left for work—and to drop his infant daughter off to daycare—when he realized he had forgotten his work ID at home. He had only reached the corner, which was approximately three houses away from his residence, so he reversed down the street until he was in front of his home, where he turned on his hazard lights and double-parked for several minutes, waiting for his girlfriend to bring him his ID. Defendant looked at his rearview mirror and observed an approaching unmarked police vehicle, so he moved his vehicle, parking it in his backyard; the other vehicle did not have any lights or sirens to indicate that it was attempting to effectuate a traffic stop. After defendant parked in his backyard, the other vehicle turned on its lights and sirens and parked behind him. Two officers exited the vehicle and approached, asking why he "was running away from them." Defendant responded that he was not running away but simply parked on his own property. They asked for his license, insurance, and registration, which he provided. While waiting for Hureta to perform a name check, defendant denied making any furtive movements or other "random movements."

¶ 28          After returning defendant's documentation to him, Hureta asked defendant to turn off the engine and lower his window. The driver's side door was still open, but defendant lowered the passenger's side window to the level where "I felt safe enough they can see me and I could see them." The officer on the passenger's side of the vehicle reached through the window, opened the door, and removed the keys from the ignition. Defendant also noticed that the officer had placed his hand on his weapon, and defendant asked Hureta "what's the deal." Hureta told defendant not to concern himself and to focus on Hureta. Defendant indicated that, from that point, "I didn't feel safe in this condition with my daughter being in the car." The officers

indicated that defendant could step outside and continue the conversation from outside the vehicle, but defendant said that he would "feel more comfortable talking to y'all inside my vehicle." At that point, the officers informed him that they were going to detain him and search his vehicle for contraband. Defendant testified that Hureta also "threatened me and told me that my daughter was going to be placed under DCFS custody."

¶ 29    Defendant denied ever threatening the officers, but testified that he made three phone calls to his girlfriend, his mother, and his father, letting him know the situation and that he was going to be detained by the police. Shortly after speaking with his mother, she arrived at the residence; at that point, defendant was still sitting inside his vehicle. Defendant was again instructed to exit the vehicle and refused, after which he was physically pulled from the vehicle by several officers; defendant identified Hureta and Szajerski as two of the officers involved in removing him from the vehicle. Defendant admitted that he grabbed the steering wheel as he was being pulled out of the vehicle, as he "didn't want to leave the vehicle until someone came to pick up my daughter." Even though his mother had arrived by then, "[his] daughter wasn't in her custody" at that time.

¶ 30    As he was being taken to the police vehicle, defendant was "slammed onto the hood of" a nearby vehicle, which hurt his abdomen, and defendant fell to the ground. The officers then picked him up and carried him by the limbs to the police vehicle, which caused him pain. Defendant had lost his glasses when he was removed from his vehicle, so he was unable to see clearly, and had "dirt and debris" on his face and body, including in his mouth. His "first reaction was to get the foreign substances out of my mouth," so he spat toward the ground outside the police vehicle. He did not notice where Szajerski was standing at the time, but knew that he was nearby, as he was pushing defendant's legs into the police vehicle.

¶ 31    On cross-examination, defendant admitted that he was not happy when he was stopped by the police and was yelling and cursing during his interactions with them. Defendant also admitted to telling the officers that "it was about to get worse with one phone call," then proceeded to make three phone calls. Defendant further admitted that he cursed at Szajerski as Szajerski closed the door to the police vehicle.

¶ 32    On redirect examination, defendant testified that the officers were cursing at him throughout the interaction, as well, with Hureta informing him at one point that "it was going to be your bad f*** day."

¶ 33                                    *Rebuttal Witnesses*

¶ 34    After the defense had presented its case-in-chief, the State called Hureta and Szajerski as rebuttal witnesses. In each case, the officer again authenticated the video from the body-worn camera he was wearing during the time in question, and the same video from earlier was admitted into evidence and played for the jury, this time with audio.[5]

¶ 35    At the beginning of Hureta's video, as he approaches defendant, defendant can be heard in the background informing him that there is a baby inside the Mazda. Hureta responds by congratulating him on the baby, but informs him that he is not permitted to reverse down a one-way street or double-park. Defendant appears annoyed, but hands over his documentation. After Hureta completes the name check, as he returns, Moreno approaches him and indicates that defendant made movements toward the center console after Hureta walked away.

¶ 36    Hureta returns to the Mazda and asks defendant to lower the passenger's side window, then asks, "so why are you driving recklessly with a baby in the back?" Defendant denies he was

---

[5] We note that Hureta's video stops at an earlier point than the previously-admitted version with no audio, but otherwise appears identical to that version.

driving recklessly and Hureta disagrees, saying that he had been speeding and reversing down a one-way street, and defendant interrupts, denying that he was speeding. Defendant then indicates that it had been a bad day, and that "it's gonna to get even worse for you two d*** if y'all don't leave me the f*** alone." Hureta asks if that was a threat and defendant states that it was not, but that they are on his property, the purpose of the traffic stop had ended, and they were now trespassing. Hureta indicates that they still had the right to be on the property, and defendant states that he disagrees, growing increasingly agitated, especially when Hureta suggests that defendant had "sped away" upon observing the police vehicle.

¶ 37    Hureta asks defendant to step outside the vehicle, and defendant indicates that he is going to call his father. Hureta asks defendant to exit the vehicle again, but defendant remains on the phone with his father, explaining that the police had stopped him. As he speaks, Hureta asks him to exit the vehicle again, while Moreno opens the passenger's side door and places his hand on his firearm. When Moreno opens the door, defendant places the call on speakerphone and narrates that the officer is now entering his vehicle without permission and, upon observing Moreno placing his hand on his firearm, defendant grows more agitated, asking repeatedly why he is holding his firearm and asking if he is planning to shoot defendant with his baby in the vehicle. Defendant holds his hands in front of him, repeatedly expressing concern about the officer shooting him and when Hureta asks him again to exit the vehicle, indicates that he is not leaving, as he is afraid that if he does, he would be killed. Hureta indicates that defendant is "acting a little hostile," and defendant yells in response, "Because I'm f*** scared!"

¶ 38    Defendant then makes another phone call and again relays that he is stopped by the police and is afraid they will shoot him, reciting the officers' names and badge numbers. Hureta again demands that defendant exit the vehicle and defendant refuses. Defendant's mother then

appears, asking him to calm down, but defendant continues to be agitated, informing his mother that Moreno was "ready to draw his gun on me *** with my baby in the car." While defendant is talking to his mother, Moreno removes the keys from the ignition, and defendant becomes more upset, indicating that the officers had no jurisdiction to do so. The video then ends.

¶ 39　　In Szajerski's video, the video opens with defendant and his mother expressing concern about the officers' firearms, and the officers repeatedly state that he will not be shot and that he had never been threatened with a weapon. Defendant points to the fact that Moreno previously had his hand on his firearm, and argues that there were "way too many" officers for him to feel comfortable. He then again expresses concern about being killed, and Moreno asks him to exit the vehicle. Moreno indicates that no one was threatening him with a firearm and defendant responds, "you did, m***! You reached for your gun! That's the biggest f*** threat that you could do in Chicago!" Moreno then states, "you spit in my face one more time, then we're going to have a f*** problem," and defendant responds, "What you gonna do? You gonna kill me?" Moreno proceeds to reach into the vehicle and handcuff defendant, while Szajerski attempts to remove defendant from the vehicle. Defendant's mother can be heard in the background, crying and saying "please don't kill" him. After defendant is pulled from the vehicle and handcuffed, he continues cursing at the officers while they handcuff him and transport him to the police vehicle.

¶ 40　　In the second video, which is shorter, a spitting sound can be heard, and defendant states "F*** off" as the door to the police vehicle swings closed.

¶ 41　　After deliberations, the jury found defendant guilty of aggravated battery to a peace officer. Defendant's motion for a new trial was denied, and he was ultimately sentenced to 30 months' probation. Defendant timely filed a notice of appeal, and this appeal follows.

14

¶ 42                                                    ANALYSIS

¶ 43          On appeal, defendant contends that the State failed to prove him guilty of aggravated battery to a peace officer where it failed to establish beyond a reasonable doubt (1) that the officers were performing an official duty in good faith and (2) that defendant was aware they were doing so. When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Instead, "it is our duty to carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004), and *Smith*, 185 Ill. 2d at 541).

¶ 44          In this case, defendant was found guilty of aggravated battery to a peace officer, which required the State to prove (1) that defendant committed a battery other than by the discharge of a firearm and (2) that he knew the battered individual to be a peace officer "performing his or her official duties." 720 ILCS 5/12-3.05(d)(4) (West 2022). On appeal, defendant does not dispute that the State established the first proposition, namely, that he committed a battery by

spitting on Szajerski, but challenges only the second proposition. Specifically, defendant contends that the State failed to prove that Szajerski was a peace officer performing his official duties or that defendant was aware of that fact.

¶ 45     Defendant's argument on appeal is premised on his challenge to the traffic stop itself. Defendant claims that the traffic stop was unconstitutional or, at a minimum, that the officers exceeded the scope of a permissible stop, and, therefore, the officers were not performing their official duties at the time he spit on Szajerski. He further contends that even if they were considered to have been performing their official duties, he was unaware of this fact, as he believed that the traffic stop was unlawful.

¶ 46     As an initial matter, the State claims that, since defendant's argument is, in essence, a challenge to the constitutionality of the traffic stop, it should have been raised in a motion to quash or motion to suppress. The State further suggests that defendant's failure to raise the issue in such a pretrial motion results in the forfeiture of his argument on appeal. The issue of whether a defendant was arrested without probable cause must be raised before the trial court in the first instance or else it is forfeited on appeal. *People v. Nilsson*, 44 Ill. 2d 244, 246-47 (1970); *People v. Jarrell*, 248 Ill. App. 3d 1043, 1049 (1993). In this case, defendant's argument concerning the constitutionality of the traffic stop is not the typical one in which a criminal defendant seeks to quash his arrest or suppress evidence found as a result of the stop. Instead, defendant claims that the alleged impropriety of the traffic stop affects the determination as to whether the police officers were performing their official duties at the time of the battery. As such, defendant contends that his challenge to the traffic stop, in this context, is part of a sufficiency-of-the-evidence analysis and is therefore not forfeited for that purpose.

¶ 47    We observe, however, that raising issues of probable cause in a pretrial motion to quash or motion to suppress permits both parties to develop the factual record concerning the circumstances surrounding the traffic stop and subsequent arrest. See, *e.g.*, *People v. Krinitsky*, 2012 IL App (1st) 120016, ¶ 26 (finding that, where the State raised a new argument concerning the defendant's fourth amendment claims for the first time on appeal, that argument was forfeited, as "this argument would have been best presented in the circuit court, where both sides would have been able to present evidence outlining their respective positions"). Here, defendant makes numerous factual claims concerning the officers' intentions and motivations during the traffic stop, including a claim that they "used the stop as a pretext to harass" him. Since defendant's claims were never raised below, however, neither party developed a full evidentiary record on the matter, and the trial court was never afforded the opportunity to make findings of fact concerning the propriety of the traffic stop and arrest.[6] See *People v. Harris*, 228 Ill. 2d 222, 230 (2008) (in ruling on a motion to suppress, a trial court makes factual findings which may be rejected only if they are against the manifest weight of the evidence).

¶ 48    At oral argument in this appeal, defense counsel contended that a motion to suppress or to quash defendant's arrest would have been fruitless, as his conviction concerned his activities after the traffic stop in question. As discussed further below, we agree with the general proposition that the relevant conduct in the instant case is defendant's behavior in response to the traffic stop. Even if defendant's decision not to file a motion to suppress or quash was reasonable, however, such a motion was not the only way in which defendant could seek to

---

[6] We note that defense counsel attempted to raise issues concerning the reasons for the traffic stop during his cross-examination of Hureta and during closing argument, but was not permitted to do so based on a pretrial ruling on the State's motion *in limine* to bar such a line of questioning.

make a full evidentiary record on the propriety of the arrest. Although not included in the record on appeal, it appears that the State filed a motion *in limine* seeking to bar defendant from challenging the propriety of the traffic stop and subsequent arrest based on his failure to file a motion to suppress or quash.[7] Defendant could have objected to that motion *in limine*, which, if ultimately denied, would have permitted it to develop an adequate evidentiary record during the trial itself. While defense counsel suggested that the motion *in limine* should not have been granted, defendant did not object to the motion below, nor did he raise it in his brief on appeal, so the question is not properly before us on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued in the appellant's brief may not be raised in oral argument).

¶ 49     As an appellate court, we are not in a position to decide new issues of fact for the first time on appeal. See *People v. Hughes*, 2015 IL 117242, ¶ 46 (finding that where the defendant raised new theories concerning the voluntariness of his confession for the first time on appeal for which the record was not adequately developed, "the appellate court ought not to have decided these factual issues anew"). As our supreme court observed in *Hughes*, "[b]y declining or failing to raise these claims below, defendant deprived the State of the opportunity to challenge them with evidence of its own, he deprived the trial court of the opportunity to decide the issue on those bases, and he deprived the appellate court of an adequate record to make these determinations." *Id.* Accordingly, we agree with the State that defendant's challenges to the propriety of the traffic stop and his subsequent arrest have been forfeited on appeal to the extent that they require us to make factual findings as to the officers' motivations.

¶ 50     Even, however, if we were to consider defendant's arguments concerning the propriety of the stop, defendant's challenge to the constitutionality of the traffic stop does not substantively

_____

[7] The parties agreed at oral argument that the State filed such a motion.

affect our analysis of the question at issue on appeal. Our supreme court has made clear that a defendant may not engage in unlawful behavior in response to actions by police officers which violate the fourth amendment. See *People v. Abrams*, 48 Ill. 2d 446, 455-56 (1971); *People v. Locken*, 59 Ill. 2d 459, 465 (1974); *People v. Villarreal*, 152 Ill. 2d 368, 378-79 (1992). See also 720 ILCS 5/7-7 (West 2022) ("A person is not authorized to use force to resist an arrest which he knows is being made *** by a peace officer ***, even if he believes the arrest is unlawful and the arrest in fact is unlawful."). Thus, in *People v. McIntosh*, 2020 IL App (5th) 170068, ¶ 57, the Fifth District found that the constitutionality of a traffic stop was "not relevant" to the determination of whether an officer was engaged in performance of his official duties for purposes of the aggravated battery statute. The *McIntosh* court further found that, "[i]nstead, a peace officer is executing his 'official duties' when acting in the good faith performance of his job-related duties regardless of whether those actions are later determined to be constitutionally unreasonable." *Id.*

¶ 51    In this case, defendant focuses on the *McIntosh* court's use of the term "good faith" to suggest that the officers in this case were not acting in good faith where they were violating his fourth amendment rights. Defendant's reliance on this language, however, is misplaced. First, the statute defining the offense does not use the term "good faith," simply requiring that the defendant know that the battered individual is "[a] peace officer *** performing his or her official duties ***." 720 ILCS 5/12-3.05(d)(4) (West 2022). Moreover, the *McIntosh* court's use of that term occurred in the context of its rejection of the same argument defendant makes here, namely, that the officers could not be engaged in official duties when they were executing an unlawful traffic stop. See *McIntosh*, 2020 IL App (5th) 170068, ¶ 57. Defendant's interpretation is thus directly at odds with the *McIntosh* court's analysis on the matter. We also

observe that courts have found similar individuals to be performing official duties even when doing so inappropriately, further demonstrating that "good faith" is not a separate requirement of the analysis. See, *e.g.*, *People v. Smith*, 342 Ill. App. 3d 289, 296 (2003) (finding correctional officer "performed his duty in a flippant, insulting, and provocative manner, but he was nevertheless performing a duty"). Instead, we agree with the Fourth District that the relevant distinction is whether "the victim was engaged in the good-faith performance of a job-related duty or solely in [his] own personal pursuits unrelated to any occupational duty." *People v. Campbell*, 2021 IL App (4th) 190525-U, ¶ 19.

¶ 52        We similarly find unpersuasive defendant's reliance on cases discussing "authorized acts." Again, the statute at issue does not require the battered individual to be performing an authorized act, but "performing his or her official duties." 720 ILCS 5/12-3.05(d)(4) (West 2022). These terms are not synonymous, despite defendant's attempts to highlight their similarities. See *People v. Brock*, 2023 IL App (5th) 220396-U, ¶ 26; *People v. Jones*, 2015 IL App (2d) 130387, ¶ 19; *City of Champaign v. Torres*, 214 Ill. 2d 234, 252 (2005) (Freeman, J., dissenting) (characterizing " 'official duties' " as covering "a broader range of police activity" than " 'authorized act[s]' "). Thus, the case law cited by defendant is of limited use for the purposes of the question before us in the current appeal.

¶ 53        We also observe that the conduct in question is that of Szajerski, the victim of the battery, so any alleged impropriety which occurred prior to his arrival bears little weight on the question of whether *he* was performing his official duties at the time defendant spit on him. See *Smith*, 342 Ill. App. 3d at 295-96 (even though a correctional officer had allegedly called the defendant a racially derogatory name two days earlier, "because the issue is whether [he] was performing his official duties at the time of the assault, only events contemporaneous with the

assault are relevant to the question of guilt). In this case, when defendant spit on him, Szajerski was in the process of placing defendant into a police vehicle after he had been arrested. There can be no dispute that this conduct is squarely a job-related duty which is properly characterized as part of a police officer's "official duties" for purposes of the aggravated battery statute.[8] Accordingly, a rational trier of fact could certainly have found that Szajerski was performing his official duties at the time of defendant's battery.

¶ 54    We also find that a rational trier of fact could have found that defendant was aware that Szajerski was a peace officer performing his official duties at the time defendant spit on him. Defendant does not dispute that he knew that Szajerski was a police officer, nor could he, as Szajerski was wearing an official police uniform during the entirety of the proceedings. Instead, defendant contends that, since he believed the traffic stop was unlawful, he did not know that Szajerski was engaged in his official duties at the time of the battery. We do not find this argument persuasive.

¶ 55    Defendant's position would essentially establish a defense to a charge of aggravated battery to a peace officer based on the defendant's alleged belief that the police officer was acting unlawfully. As explained above, however, our supreme court—and our legislature—have made clear that the illegality of an arrest does not excuse a defendant's use of force. See *Abrams*, 48 Ill. 2d at 455-56; *Locken*, 59 Ill. 2d at 465; *Villarreal*, 152 Ill. 2d at 378-79; 720 ILCS 5/7-7 (West 2022). Defendant's interpretation of the law is thus irreconcilable with the clear prohibition against the use of force in such a situation, and none of the cases defendant cites stand for such a proposition.

---

[8] Indeed, an arrest—including an unlawful one—is even considered an "authorized act" under the law. See *Locken*, 59 Ill. 2d at 465-66.

¶ 56　　　In this case, the evidence establishes that defendant was aware that Szajerski was a police officer who was assisting in the arrest of defendant. Accordingly, a rational trier of fact could have found that, when defendant spit on Szajerski, he was aware that he was spitting on a peace officer who was performing official duties. We therefore affirm defendant's conviction for aggravated battery of a peace officer.

¶ 57　　　　　　　　　　　　　　CONCLUSION

¶ 58　　　For the reasons set forth above, we affirm defendant's conviction for aggravated battery to a peace officer, as a rational trier of fact could have found beyond a reasonable doubt that defendant spit on Szajerski while knowing he was a peace officer engaged in the performance of his official duties.

¶ 59　　　Affirmed.